**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:25-cr-02-LM-AJ-02/02** |
| | ) | |
| **OLD DUTCH MUSTARD CO., INC.,** | ) | |
| **d/b/a PILGRIM FOODS, INC.** | ) | |
| | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America by its attorneys, John J. McCormack, Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515, and Todd Kim, Assistant Attorney General for the Environment and Natural Resources Division, United States Department of Justice, and the defendant, Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, Inc. ("Old Dutch Mustard" or "Old Dutch"), and the defendant's attorneys, S. Amy Spencer, Esquire, and Mathew J. Todaro, Esquire, enter into the following Plea Agreement:

1. <u>The Plea and the Offense</u>.

The defendant agrees to waive its right to have this matter presented to a grand jury and plead guilty to an Information charging it with three counts of Knowing Discharge of a Pollutant Without a Permit, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A).

In exchange for the defendant's guilty plea, the United States Attorney's Office for the District of New Hampshire and the Environmental Crimes Section, United States Department of Justice (collectively, the "United States"), agree to the sentencing stipulations identified in Section 6 of this agreement.

2.   The Statute and Elements of the Offense.

Title 33, United States Code, Section 1311, prohibits the "discharge of any pollutant" without a permit issued pursuant to the National Pollutant Discharge Elimination System ("NPDES"), which in New Hampshire is administered by the United States Environmental Protection Agency ("EPA"). 33 U.S.C. § 1311(a); *United States v. Agosto-Vega*, 617 F.3d 541, 548-49 (1st Cir. 2010).   The term "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).   The term "point source" includes "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, . . . conduit, . . . [or] discrete fissure . . . from which pollutants are or may be discharged."   33 U.S.C. § 1362(14).

Title 33, United States Code, Section 1319 provides, in pertinent part:

Any person who . . . knowingly violates section 1311 . . . of this title . . . shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both.

33 U.S.C. § 1319(c)(2)(A).

Title 18, United States Code, Section 2 provides, in pertinent part:

Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2(b).

The defendant understands that the offense has the following elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

First, the defendant discharged a pollutant on or about the dates alleged in the information;

Second, the pollutant was discharged from a point source;

<u>Third</u>, the pollutant was discharged into a navigable water of the United States (the Souhegan River);

<u>Fourth</u>, the defendant did so without an NPDES permit; and

<u>Fifth</u>, the defendant did so knowingly.

*Eighth Circuit Model Jury Instructions, 2023 Edition,* Instruction 6.33.1311(A), https://juryinstructions.ca8.uscourts.gov/instructions/criminal/Criminal-Jury-Instructions.pdf; *United States v. Agosto-Vega*, 617 F.3d 541, 548–49 (1st Cir. 2010).

    3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would introduce evidence of the following facts, which would prove the elements of the offenses beyond a reasonable doubt:

The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (commonly referred to as the Clean Water Act or "CWA"), prohibits the discharge of any pollutant into navigable waters of the United States except in compliance with an NPDES permit issued pursuant to 33 U.S.C. § 1342. The Souhegan River is a navigable water of the United States.

Charles Santich is the president and owner of the defendant, Old Dutch Mustard. Old Dutch is a New York corporation that was acquired by the Santich Family in 1941. Old Dutch manufactures mustard and vinegar at its facility in Greenville, New Hampshire (the "Old Dutch facility" or the "facility"). This manufacturing process generates, among other things, acidic, low pH, wastewater, which is a pollutant as defined by the CWA.[1] Old Dutch does not have an NPDES permit or any other permit allowing it to discharge any of its wastewater to nearby

---

[1] The wastewater at issue in this case is from the manufacturing process at Old Dutch, not sanitary waste or sewage.

waters including the Souhegan River. To dispose of its wastewater, Old Dutch is supposed to store the wastewater in tanks at its facility and pay a trucking company to haul the wastewater to the Rochester publicly owned treatment plant; the treatment plant is able to use the wastewater in its treatment process because of the acidic nature of the wastewater. In general, the trucking company removes wastewater from the Old Dutch facility in tanker trucks every business day, and Old Dutch pays the transportation company on a per load basis. By approximately 2013 or 2014, Santich took on leadership roles at Old Dutch, including president and general manager, and has ultimate responsibility for environmental compliance at the Old Dutch facility.

Old Dutch is subject to a stormwater permit (referred to as the Multisector General Permit for stormwater discharges associated with industrial activity) that authorizes it to discharge only uncontaminated, pH neutral stormwater from three stormwater outfalls that flow into an "Unnamed Brook" located at the south side of the facility. After it passes the Old Dutch facility, the Unnamed Brook flows into the Souhegan River. Some of the ground at the Old Dutch facility contains residue from many years of past spills and leaks of vinegar and other materials, especially the tank farm storage area. Stormwater or any other water that becomes acidic by flowing through these areas or for any other reason is wastewater and is not permitted to be discharged through the three stormwater outfalls or otherwise into nearby waters. Acidic, low pH stormwater is hauled off-site along with the facility's other wastewater. Acidic, low pH stormwater is a pollutant under the CWA.

Old Dutch has a history of CWA non-compliance with the stormwater permit dating back to the 1980s, resulting in several enforcement actions brought by the EPA, the United States Department of Justice, New Hampshire Department of Environmental Services ("NH DES"),

and the New Hampshire Attorney General's office to attempt to bring the facility into compliance.[2] As a result, EPA and NH DES have required very close monitoring of the discharges to the Unnamed Brook. For example, in 2004, the United States and Old Dutch entered a Consent Decree that required Old Dutch to pay a civil penalty, terminate all unpermitted discharges from its facility, develop an environmental management system, and provide reports of monitoring and inspections. In 2014, EPA issued an Administrative Order and Request for Information to Old Dutch pursuant to 33 U.S.C §§ 1318(a) and 1319(a)(3)(a) that required continuous monitoring of the pH (through the installation of water quality monitoring sondes that took pH measurements every 15 minutes) at three locations: an upstream Unnamed Brook location, a downstream Unnamed Brook location and at a mid-point catch basin at the facility. In 2016, Old Dutch entered into a consent decree with New Hampshire to address stormwater discharges and the release of hazardous waste (a spent phosphoric acid cleaning solution) to the Unnamed Brook that similarly required Old Dutch to maintain a continuous water quality monitoring program in the Unnamed Brook using the monitoring sondes consistent with the requirements in EPA's 2014 Order. The sondes were to be checked every two weeks by an independent environmental consultant with data submitted to EPA and NH DES.

In approximately April or May 2015, Santich hired an excavation company to install and bury a pipe from the Old Dutch facility to transport water to tanks located up hill and behind the facility. Between August 2016 and September 2017, Santich ordered an employee to dismantle

---

[2] New Hampshire brought its actions under the New Hampshire Water Pollution and Waste Disposal Act, RSA chapter 485-A, which makes it unlawful to lower the water quality of a receiving water, and the Hazardous Waste Management Act, RSA chapter 147-A (a liquid with a pH lower than 2 is considered a corrosive hazardous waste).

the water storage tanks and, in approximately May 2017, he hired the same excavation company to extend the underground pipe to an old, abandoned railroad bed at the top of the hill behind the facility; the pipe pointed generally in the direction of the Souhegan River. Beginning at about that time, Santich directed Old Dutch employees to repeatedly pump wastewater and acidic stormwater through the underground pipe to the abandoned railroad bed. At Santich's direction, the employees used a three-way valve located in the facility to direct the wastewater and acidic stormwater through the buried pipe. The three-way valve could direct wastewater and acidic stormwater that had flowed through the tank farm area either to the wastewater storage tanks or to the underground pipe to discharge the water at the top of the hill. Once the wastewater or acidic stormwater discharged at the top of the hill, it flowed along the manmade swale or ditch down the abandoned railroad bed toward the Souhegan River until it reached a natural swale and then a sharp drop-off, where it flowed through natural gullies to the river. Santich attempted to keep the use of the buried pipe to discharge wastewater and acidic stormwater hidden, including by covering the end of the pipe with dirt and brush and giving directions to employees not to tell anyone about it. Following Santich's directions, no one, including Santich, told even the company's environmental consultant about it.

Santich also took steps to facilitate the discharge of the wastewater and acidic stormwater to the river. For example, in about March 2021, Santich directed the excavation company that had installed the buried pipe to install an underground sump at the corner of the tank farm area that collected acidic stormwater that had flowed through the tank farm area and could pump it directly up the hill through the buried pipe. Similarly, in Fall 2022, Santich hired the same excavation company to clean out undergrowth from the manmade ditch at the top of the hill and

line it with riprap to facilitate the flow of wastewater and acidic stormwater to the river. At some points the riprap ditch is narrow and in other places it broadens to the width of the railroad bed, but it consistently directs the wastewater discharged from the pipe to the natural swale and drop-off that flowed through natural gullies to discharge into the Souhegan River. Similarly, the plumbing of the facility was modified to make it easier for wastewater to be pumped up the hill behind the facility.

Santich, directly instructed at least three employees and indirectly through other employees instructed at least one additional employee to send wastewater and acidic stormwater up the hill. In addition, at least one of Santich's employees directed junior employees to pump wastewater through one of the facility's food processing lines to a large outdoor storage tank. The wastewater was then pumped from the tank and up the hill. Former employees would also testify to their knowledge of the illegal discharges based on observations they made at the facility and conversations they had with employees who were directly involved in the discharges. The owner of the excavation company would testify to the work his company performed at the Old Dutch facility, always at Santich's direction, as would the worker who improved the drainage ditch and lay the riprap along the abandoned railroad bed.

In addition, in April and May 2023, problems at the facility resulted in the generation of high volumes of wastewater that exceeded the holding capacity of equipment being used by the facility for wastewater. In May, state inspectors from NH DES discovered wastewater from the facility with low pH and smelling of vinegar flowing from the manmade, riprap-lined ditch at the top of the hill on the Old Dutch property into the Souhegan River. Santich, who was present at the NH DES inspection, attempted to explain away the obvious wastewater discharges at the top

of the hill with the false representation that it was only a failed attempt to plant mustard seed there.

In August 2023, federal investigators executed a search warrant and discovered the buried pipe that discharged just over the top of the hill approximately 460 feet behind, and up a slope approximately 30 feet above, the facility. Investigators observed wastewater actively flowing from the pipe at the top of the hill at the time of the search. They sampled and tested the wastewater; it had an acidic pH of approximately 3.6. Because the pipe discharged just over the top of the hill, the wastewater did not flow downhill into the monitored Unnamed Brook. Instead, the investigators observed the wastewater discharge from the pipe into the riprap-lined drainage ditch that eventually discharged into the natural swale and into the Souhegan River. The manmade ditch also directed the wastewater to discharge into the Souhegan River to the northeast of the facility. This discharge point was downstream of, and not detectible by, the continuous environmental monitoring required by the EPA and State of New Hampshire.

    4.   <u>Penalties, Special Assessment and Restitution</u>.

The defendant understands that the penalties for the offense are:

A.      A minimum term of probation of one year and maximum term of probation of five years per count (18 U.S.C. § 3561(c)(1));

B.      A minimum fine of $5,000 and a maximum fine of the greater of $50,000 per day of violation or $500,000 or twice the gross gain derived from the offense or twice the gross loss resulting from the offense (33 U.S.C. § 1319(c)(2); 18 U.S.C. §3571(c)(3), (d));

C.      A mandatory special assessment of $400 for each count of conviction, at or before the time of sentencing (18 U.S.C. § 3013(a)(2)(B)); and

D.      In addition to the other penalties provided by law, the Court may order the defendant to pay restitution to the victim(s) of the offense (18 U.S.C. § 3663 or § 3663A).

The defendant further agrees that, if restitution is ordered, it shall be due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. If the Court imposes a schedule of payments, the defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full, including, but not limited to, the Treasury Offset Program.

E.    The Court may also order forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a felony violation of the Clean Water Act (18 U.S.C. § 981(a)(1)(C)). Substitute assets are also subject to forfeiture.

To facilitate the payment and collection of any restitution or forfeiture that may be ordered, the defendant agrees that, upon request, it will provide the United States with a financial disclosure statement and supporting financial documentation.

5.   Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. Except for the Rule 11(c)(1)(C) sentencing stipulations provided for in Section 6 of this Agreement, the defendant understands that it has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or sentence is other than it anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

A.    Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B.    Respond to questions from the Court;

C.    Correct any inaccuracies in the pre-sentence report;

D.    Respond to any statements made by the defendant or its counsel to a

- 9 -

probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that it may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. 11(c)(1)(C), the United States and the defendant stipulate and agree to the following:

(a)   Five years' probation is the appropriate disposition of this case.

(b)   A fine of $1.5 million is the appropriate fine for the defendant to pay in this case.

(c)   An order by this Court requiring defendant to establish an effective environmental compliance program ("ECP") and environmental ethics program ("EEP") is also an appropriate part of the disposition of the case. The purpose of the ECP is to perform an independent and comprehensive assessment and analysis of the causes of recent and continuing CWA violations at the Old Dutch facility, and design and implement corrective actions to prevent future violations. The purpose of the EEP is to reasonably design, implement and enforce a program at the Old Dutch facility that is generally effective in preventing and detecting criminal

conduct, as defined in U.S.S.G. § 8B2.1. The United States and the defendant agree that, as a condition of probation, the defendant will establish an effective ECP and EEP regarding environmental matters at the Old Dutch facility, as set forth in greater detail in Attachment A to this Plea Agreement.

(d) The defendant may move for early termination of probation after satisfying the special conditions of probation concerning environmental compliance, including those set forth in Attachment A to this Plea Agreement, and the conditions laid out in 18 U.S.C. §§ 3564(c) and 3583(e)(1).

The parties intend the above stipulations to be "binding" under Fed. R. Crim. P. 11(c)(1)(C). By using the word binding the parties mean, and defendant understands, that if the Court will not accept the plea agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw its guilty plea[s]. Defendant further understands that if the guilty plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.

The parties are free to make recommendations with respect to the fines, conditions of probation, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. <u>Waiver of Trial Rights and Consequences of Plea.</u>

The defendant understands that it has the right to be represented by an attorney at every

- 11 -

stage of the proceeding.   The defendant also understands that it has the right:

A.      To plead not guilty or to maintain that plea if it has already been made;

B.      To be tried by a jury and, at that trial, to the assistance of counsel;

C.      To confront and cross-examine witnesses; and

E.      To compulsory process for the attendance of witnesses to testify in its defense.

The defendant understands and agrees that by pleading guilty it waives and gives up the foregoing rights and that upon the Court's acceptance of its guilty plea, it will not be entitled to a trial.

The defendant understands that if it pleads guilty, the Court may ask it or its agent or agents questions about the offenses, and if it or its agent or agents answers those questions falsely under oath, on the record, and in the presence of counsel, those answers will be used against it in a prosecution for perjury or making false statements.

8.   Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that it:

A.      Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because it is guilty;

B.      Is entering into this Plea Agreement without reliance upon any promise or benefit of any kind except as set forth in this Plea Agreement or revealed to the Court;

C.      Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.      Understands the nature of the offenses to which it is pleading guilty, including the penalties provided by law; and

E.      Is completely satisfied with the representation and advice received from its undersigned attorneys.

9.   Scope of Agreement.

- 12 -

The defendant acknowledges and understands that this Plea Agreement binds only the United States Attorney's Office for the District of New Hampshire and the Environmental Crimes Section of the United States Department of Justice and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to it or its agent or agents about any civil or administrative consequences that may result from its guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

10.    Collateral Consequences.

The defendant understands that as a consequence of its guilty plea it will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights and may thereby be barred from entering into certain government contracts, including pursuant to 33 U.S.C. § 1368. The defendant understands that the United States reserves the right to notify any state or federal agency of the fact of this conviction, and this plea agreement does not provide any protection from collateral consequences to the defendant resulting from the fact of this guilty plea.

11.    Forfeiture.

The defendant agrees to immediately and voluntarily forfeit to the United States its interest, if any, in any and all assets subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 as a result of its guilty plea.

The defendant also agrees to the entry of a joint and several criminal forfeiture money

- 13 -

judgment, pursuant to Fed. R. Crim. P. 32.2(b)(1), against it and its codefendant CHARLES

SANTICH in an amount to be determined on or before the date of sentencing. The money

judgment shall represent a fair estimate of the gross proceeds which the defendant obtained,

directly or indirectly, as a result of the offenses to which it is pleading guilty, specifically the

knowing discharge of a pollutant without a permit, in violation of 33 U.S.C. §§ 1311(a),

1319(c)(2)(A). If the proceeds derived by it from the offenses, can no longer be located upon the

exercise of due diligence by the United States, or are otherwise beyond the jurisdiction of this

Court, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p)(l)(A)-(E), the United States is

entitled to forfeit substitute property in which the defendant has an interest up to the amount to

be determined by the Court at the time of sentencing.

The defendant agrees to waive its right to have the Court separately determine the

forfeiture of substitute property under 21 U.S.C. § 853(p)(2) and Fed. R. Crim. P. 32.2(e). The

defendant further agrees to waive the procedures set forth in Fed. R. Crim. P. 32.2(e)(2), and to

waive any defenses to forfeiture of the substitute asset. The defendant agrees to the entry of an

order by this Court forfeiting said substitute property.

Any properties of the defendant forfeited as proceeds of the offenses, or as substitute

assets shall be credited to the money judgment.

The defendant agrees and consents to the forfeiture of its interest in these assets pursuant

to any criminal, civil and/or administrative forfeiture action brought to forfeit these assets.

None of the forfeitures set forth in this section shall be deemed to satisfy or offset any

fine, restitution, or other penalty imposed upon the defendant, nor shall the forfeitures be used to

offset the defendant's tax liability or any other debt owed by the defendant to the United States.

The defendant agrees to waive all constitutional, statutory, and any other challenges in any manner, including, without limitation, by direct appeal and/or habeas corpus, to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including but not limited to the following: (1) the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the U.S. Constitution; (2) failure to comply with any and all requirements of Fed. R. Crim. P. 11(b)(1)(J) pertaining to the Court's advice at the change of plea hearing; and, (3) failure to comply with any and all requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument and announcement of the forfeiture at sentencing and incorporation of the forfeiture in the judgment. The defendant further acknowledges that it understands that the forfeiture of assets is part of the sentence that may be imposed in this case.

The defendant waives and releases any and all claims it may have to any property seized by the United States, or any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, whether forfeited or not. The defendant agrees to hold the United States, its agents, and employees, and any state or local law enforcement agency participating in the investigation and prosecution of this case, harmless from any claims whatsoever in connection with the seizure and forfeiture, as well as the seizure, detention and return of any property in connection with the investigation and prosecution of this case.

12.  Satisfaction of Federal Criminal Liability; Breach.

The defendant's guilty plea, if accepted by the Court, will satisfy its federal criminal liability in the District of New Hampshire arising from its participation, and the participation of

- 15 -

its employees acting within the scope of their employment and for the defendant's benefit, in the conduct that forms the basis of the Information in this case.

The defendant understands and agrees that, if after entering this Agreement, it fails specifically to perform or fulfill completely each one of its obligations under this Agreement, fails to appear for sentencing, or engages in any criminal activity prior to sentencing, it will have breached this Agreement.

If the United States, in its sole discretion, and acting in good faith, determines that the defendant committed or attempted to commit any further crimes, failed to appear for sentencing, or has otherwise violated any provision of this Agreement, the United States will be released from its obligations under this Agreement, including, but not limited to, any agreement it made to dismiss charges, forbear prosecution of other crimes, or recommend a specific sentence or a sentence within a specified range. The defendant also understands that it may not use its breach of this Agreement as a reason to withdraw its guilty plea or as a basis to be released from its guilty plea.

13. <u>Waivers</u>.

A.   Appeal.

The defendant understands that it has the right to challenge its guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives its right to challenge on direct appeal:

1.   Its guilty plea and any other aspect of its conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; or claims challenging the constitutionality of the statute of conviction; and

2.   The sentence imposed by the Court if it is consistent with or lower than

the stipulated sentence or the stipulated sentencing range specified in Section 6 of this agreement.

The defendant's waiver of its rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

B.   Collateral Review.

The defendant understands that it may have the right to challenge its guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255.   By entering into this Plea Agreement, the defendant knowingly and voluntarily waives its right to collaterally challenge:

1.   Its guilty plea, except as provided below, and any other aspect of its conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2.   The sentence imposed by the Court if it is consistent with the stipulations specified in Section 6 of this agreement.

The defendant's waiver of its right to collateral review does not operate to waive a collateral challenge to its guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of its right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts.

The defendant hereby waives all rights, whether asserted directly or through a

representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government.

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant 18 U.S.C. § 3742(b) to pursue an appeal as authorized by law.

14.   No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15.   Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorneys and until it is signed by the United States Attorney for the District of New Hampshire, Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515, or an Assistant United States Attorney, and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, or a Trial Attorney for the Environmental Crimes Section.

16.   Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

Date: January 16, 2025

JOHN J. MCCORMACK
Attorney for the United States, Acting under
    Authority Conferred by 28 U.S.C. § 515

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division

By: _____

Matthew T. Hunter
Assistant United States Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
Matthew.Hunter@usdoj.gov

By: /s/Ronald A. Sarachan

Ronald A. Sarachan
Trial Attorney
Environmental Crimes Section
150 M Street N.E., Suite 4.108
Washington, D.C. 20002
Ronald.Sarachan@usdoj.gov

I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this 19-page Plea Agreement. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.

Date:   Jan 16,2025

*Charles R. Santich*

Charles Santich
President and Owner of Old Dutch Mustard
Co., Inc., d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this 19-page Plea Agreement with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date: _____

S. Amy Spencer, Esquire

_____

Mathew J. Todaro, Esquire
Outside Environmental Counsel

Attorneys for Old Dutch Mustard Co., Inc.,
      d/b/a Pilgrim Foods. Inc.

- 19 -

Date:_____

JOHN J. MCCORMACK                                TODD KIM
Attorney for the United States, Acting under     Assistant Attorney General
    Authority Conferred by 28 U.S.C. § 515     Environment and Natural Resources
                                            Division

By:_____                     By:_____
   Matthew T. Hunter                              Ronald A. Sarachan
   Assistant United States Attorney               Trial Attorney
   53 Pleasant St., 4th Floor                     Environmental Crimes Section
   Concord, NH 03301                              150 M Street N.E., Suite 4.108
   Matthew.Hunter@usdoj.gov                       Washington, D.C. 20002
                                                  Ronald.Sarachan@usdoj.gov

I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this 19-page Plea Agreement. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.

Date:   _____

                                    _____
                                      Charles Santich
                                      President and Owner of Old Dutch Mustard
                                      Co., Inc., d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this 19-page Plea Agreement with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date:   01/16/2025

                                      _____
                                      S. Amy Spencer, Esquire

                                      _____
                                      Mathew J. Todaro, Esquire
                                      Outside Environmental Counsel

                                      Attorneys for Old Dutch Mustard Co., Inc.,
                                          d/b/a Pilgrim Foods. Inc.

- 19 -

environmental laws and the facility's permit(s), and how employees can report possible environmental violations.

Date:_____

JOHN J. MCCORMACK
Attorney for the United States, Acting under
    Authority Conferred by 28 U.S.C. § 515

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division

By:_____
    Matthew T. Hunter
    Assistant United States Attorney
    53 Pleasant St., 4th Floor
    Concord, NH 03301
    Matthew.Hunter@usdoj.gov

By:_____
    Ronald A. Sarachan
    Trial Attorney
    Environmental Crimes Section
    150 M Street N.E., Suite 4.108
    Washington, D.C. 20002
    Ronald.Sarachan@usdoj.gov

I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this Environmental Compliance Program and Environmental Ethics Program. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.

Date: _____

_____
Charles Santich
President and Owner of Old Dutch Mustard Co., Inc.,
d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this Environmental Compliance Program and Environmental Ethics Program with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date: _____

_____
S. Amy Spencer, Esquire

_____
Mathew J. Todaro, Esquire
Outside Environmental Counsel

Attorneys for Old Dutch Mustard Co., Inc.,
d/b/a Pilgrim Foods. Inc.

Attachment A to Plea Agreement of Old Dutch Mustard Co., Inc.,
d/b/a/ Pilgrim Foods, Inc. ("Old Dutch Mustard" or "Old Dutch")
Environmental Compliance Program and Environmental Ethics Program

1. Purpose. The purpose of the **Environmental Compliance Program** ("ECP") is to perform a comprehensive assessment and analysis of the causes of recent and continuing Clean Water Act violations at the Old Dutch facility, and design and implement corrective actions to prevent future violations, which potentially may include changes to the physical facility, equipment and raw materials, manufacturing processes, and the handling and management of stormwater, groundwater and wastewater.

   There are five major components of the ECP: selection of the independent consultant; comprehensive environmental and engineering investigation and analysis of the Old Dutch facility[1] to identify all the sources of environmental violations at the facility; the identification and design of corrective actions in a work plan; implementation of the work plan; and satisfactory completion of the work. Each component is addressed below.

   EPA and Old Dutch are parties to an Administrative Order for Compliance Issued on Consent, Docket No: CWA-AO-R01-FY25-23 (the "AOC"), the purposes of which are similar to the purposes of the ECP. The AOC is attached as Exhibit 1 to this ECP and EEP.

   Where appropriate, the ECP incorporates and adopts certain specific provisions of the AOC to reduce duplication and for ease of administration. By incorporating and adopting provisions of the AOC, it is not the intent of the parties to the ECP otherwise to narrow the ECP and, where there is any conflict between the terms of the ECP and the AOC, the ECP controls for purposes of the ECP.

2. Independent Consultant or Consultants. Old Dutch will hire an independent and qualified consultant or more than one consultant to carry out the ECP and fulfill its purposes (the "Consultant"). (For simplicity, references below are to a single Consultant. If multiple Consultants are selected, these provisions and requirements apply to all the Consultants, and the respective roles of the Consultants must be clearly defined.)

   a. Independent. The Consultant, its affiliates and agents must have provided no services to Old Dutch within the past five years and no services with respect to the Old Dutch facility at any time, unless first disclosed and approved by the United States Attorney's Office for the District of New Hampshire and the Environmental Crimes Section, United States Department of Justice (collectively, the "United States"). The United States has sole discretion to determine if the

---

[1] The "Old Dutch facility" or "facility" is the property located at 68 Wilton Road, Greenville, New Hampshire.

1

Consultant may serve in another capacity with Old Dutch prior to completion of the ECP. In addition, the Consultant will not receive any financial benefit at any time from the outcome of the ECP, apart from compensation for its services as provided by contract with Old Dutch. The Consultant, its affiliates and agents may not commence a business relationship with Old Dutch for a two-year period following the completion of the ECP.

b. Qualified. The Consultant must have sufficient expertise, experience and capabilities to carry out the ECP and fulfill its purposes. The Consultant will be deemed qualified provided that it meets all of the competency criteria set out in the AOC at ¶ 42.a.i-iv; ¶ 49.a.i-ii; and ¶ 56.a.i-ii.

c. Selection Process. Old Dutch will nominate three consultants by the date of sentencing and submit their names and proposals to the United States. The United States will evaluate and select one or more consultants from the submitted nominees within 21 days thereafter. The United States will consult with EPA in evaluating and selecting the Consultant or Consultants. If none of the nominees are acceptable because they lack the required independence or qualifications or both, the United States will notify Old Dutch, which will then have 21 days to nominate additional consultants. If none of the additional nominees are acceptable, the United States will designate the Consultant or Consultants; if Old Dutch disputes the designation by the United States, it may bring the matter to the Court.

The AOC refers to one or more Engineering Expert, Environmental Expert and Remedial Expert, AOC ¶¶ 42, 49, 55. If the Engineering and Environmental Expert or Experts are selected by Old Dutch and approved by EPA under the AOC prior to the date for selection of the Consultant under the ECP, the United States will independently evaluate that Expert(s) in lieu of the procedure stated above. If the United States determines that the Expert(s) meets the independence requirements and the relevant qualifications, then the United States will approve the Expert(s) to also serve as Consultant(s) under the ECP. The United States will conduct its evaluation and make its determination within 21 days of sentencing. Likewise, the United States may in its sole discretion waive the deadlines above and defer to the selection and approval process under the AOC of the Remedial Expert.

d. Costs and Contract. Old Dutch will be solely responsible for payment of all fees, costs and expenses of the Consultant. Within 15 days of Consultant selection, Old Dutch will provide the United States and the U.S. Probation Office with a copy of the fully executed contract between Old Dutch and the Consultant.

e. Consultant Access. Old Dutch will provide the Consultant full access to all records, personnel, and other information associated with the Consultant's performance of the ECP. During the period of probation, the Consultant will have unrestricted access to the Old Dutch facility at all reasonable times during the period of the ECP and for one year following completion of the ECP for

2

monitoring purposes. The Consultant will not have access to confidential personnel files unrelated to the purpose and completion of the ECP.

f. <u>Consultant Conduct and Communications.</u> The Consultant shall act in compliance with all applicable professional standards. The Consultant shall exercise independent judgment and act impartially to ensure that the purposes of the ECP are met. The Consultant will function independently of Old Dutch. The Consultant may communicate with principals, employees and agents of Old Dutch to obtain information. Communication between the Consultant and Old Dutch will be in writing and provided simultaneously to the United States and the U.S. Probation Office. However, where necessary, non-written communication between the Consultant and Old Dutch is permitted during site visits for the sole purpose of coordinating on-site activities such as investigation of physical assets related to production (*e.g.,* piping and tanks). The Consultant will provide all reports, status updates or other work product required by the ECP, whether draft or final, to the United States, the U.S. Probation Office, and Old Dutch at the same time. The requirement in this paragraph that communication be in writing does not apply to verbal communication that involves the United States, the U.S. Probation Office and/or EPA.

3. <u>Comprehensive Environmental and Engineering Investigation and Analysis.</u>

a. <u>Investigation.</u> The Consultant will conduct the investigation and gather the information needed to understand, assess and analyze the reasons for recent and continuing CWA violations at the Old Dutch facility, including violations of the facility's stormwater permit.[2]

b. The investigation required to be conducted and information required to be gathered are defined in the AOC ¶¶ 46, 47.a.-h ("Engineering Objectives"), and 53.a.-e. ("Environmental Objectives"), which are incorporated herein.

c. <u>Analysis.</u> The Consultant will conduct comprehensive evaluations to determine the causes and sources of unlawful discharges to the Unnamed Brook and/or the Souhegan River, including but not limited to low pH materials in the facility's stormwater, the causes and locations of stormwater entering the wastewater system, and the causes and sources of any other CWA violations.

d. <u>Work Products.</u> Within 60 days after Old Dutch provides the United States and the U.S. Probation Office with a copy of the executed contract between Old Dutch and the Consultant, the Consultant will submit a detailed Engineering and Environmental Scope of Work ("SOW") to the United States, the U.S. Probation Office and Old Dutch for conducting the comprehensive environmental and engineering investigation and analysis consistent with this ECP and the AOC.[3]

---

[2] References to the facilities stormwater permit in this Attachment A are to the current version of the NPDES Storm Water Multisector General Permit for industrial activities.

[3] Under the AOC, the Engineering and Environmental Scope of Work may be contained in separate documents. AOC ¶¶ 45, 53. A single SOW or two separate SOW documents will satisfy the requirements of the ECP. The AOC

The United States and the U.S. Probation Office may request adjustments to the SOW as deemed necessary by either of them to perform the work.

 e. The Consultant will provide the United States, the U.S. Probation Office and Old Dutch with bi-monthly Progress Reports on its progress in performing the environmental investigation and analysis.

 f. Within one year of submitting the SOW, the Consultant will complete the comprehensive investigation and analysis described above and provide a Draft Report to the United States, the U.S. Probation Office and Old Dutch. The Draft Report will include the Consultant's factual findings and determination of the sources and causes of the recent and continuing CWA violations at the facility. Within 30 days, the United States, the U.S. Probation Office and Old Dutch may submit comments and questions to the Consultant and one another. The Consultant will respond to comments and questions within 7 days and submit the Final Report within 15 days. However, the United States or the U.S. Probation Office may request that the Consultant perform additional work deemed necessary by either of them to complete any of the above tasks. If there are requests for additional work, the Consultant will submit the Final Report within 15 days of completion of the additional work.

 g. The United States will consult with EPA about the Consultant's environmental investigation and analysis, including the SOW, Progress Reports, Draft Report and Final Report, and comments of the other parties, to help ensure that the Consultant's work is efficient, effective and consistent with the AOC.

4. <u>Corrective Actions and Implementation.</u> Within 180 days of submission of the Final Report, the Consultant will prepare a Remedial SOW that recommends Corrective Actions sufficient to address the Consultant's findings about the sources and causes of the recent and continuing CWA violations and to prevent future violations. Together with the Remedial SOW and within the same time period, the Consultant will also prepare a detailed Work Plan and Schedule with Milestones for Old Dutch to implement the recommended Corrective Actions contained in the Remedial SOW.[4]

 a. The recommended Corrective Actions will be designed to meet the objectives to prevent future violations of the CWA, ensure that no unauthorized discharges of pollutants from the facility enter the Unnamed Brook or the Souhegan River, either directly or indirectly via stormwater or groundwater, ensure compliance with the stormwater permit, and address the findings of the comprehensive environmental investigation and analysis as reported in the Final Report.

---

focuses on unauthorized discharges originating from the facility's manufacturing activities or areas, storage areas, waste handling activities, and related infrastructure. AOC ¶ 53. The parties understand and intend that the ECP applies to unauthorized discharges from the facility generally and without limitation,

[4] The Remedial SOW required in the AOC, ¶ 59, may be used to satisfy the requirements of the ECP provided it meets the deadlines and requirements of the ECP.

4

b. The Consultant will submit the recommended Remedial SOW with Corrective Actions, Work Plan and Schedule to the United States, the U.S. Probation Office and Old Dutch, along with a discussion of potential alternative measures and the reasons why the Consultant's recommendations are preferred, including relative effectiveness, estimated costs, and estimated timeframe to complete the measures.

c. Within 30 days, the United States, the U.S. Probation Office and Old Dutch will submit any comments and questions to the Consultant and one another. The parties may schedule a joint meeting with the Consultant to discuss the Corrective Actions, Work Plan and Schedule, and their comments. The United States or U.S. Probation Office may request changes that either of them deem necessary to prevent future violations. Within 10 days thereafter, the Consultant will prepare the final Remedial SOW with Corrective Actions, Work Plan and Schedule and submit it to the parties.

d. The Final Report, Remedial SOW with Corrective Actions, Work Plan and Schedule will be submitted to the Court for its review and approval. If a party disagrees with the Corrective Actions, Work Plan or Schedule, it may bring the matter to the Court.

e. The United States will consult with EPA about the Corrective Actions, Work Plan and Schedule, and comments of the other parties, to help ensure that Corrective Actions, Work Plan and Schedule will be effective, appropriate and consistent with the AOC as appropriate.

5. Satisfactory Completion.

a. The Consultant will monitor Old Dutch's performance of the Court-approved Corrective Actions and will report on progress to the United States and U.S. Probation Office on a monthly basis. Old Dutch may consult with the Consultant on the implementation of the Court-approved Corrective Actions. Old Dutch will complete all work as expeditiously as practicable, in accordance with the Schedule.

b. Failure of Old Dutch to comply with or complete any of its obligations under the ECP or a Corrective Action in accordance with the Work Plan and Schedule shall constitute a basis for finding a violation of probation.

c. Old Dutch shall complete all Corrective Actions no later than four years and six months following the start of the five-year term of probation.

d. Completion of all Corrective Actions to the satisfaction of the United States, followed by a period of 6 months without a CWA violation and the discharge of pollutants into waters of the United States, shall constitute satisfactory completion of the ECP.

e. Old Dutch may apply for early termination of probation if satisfactory completion of the ECP occurs prior to the end of its 5-year term of probation.

f. The United States will consult with EPA on questions that may arise relating to satisfactory completion.

5

6.   <u>Supervision and Consultation.</u>

   a.   The U.S. Probation Office, in consultation with EPA and the United States, will have the right to periodically monitor the ECP during the 5-year probationary period, bring any violations to the attention of Old Dutch and the United States for Old Dutch to undertake corrective action, and to the Court if timely corrective action is not taken.

   b.   The parties understand that the failure of Old Dutch to comply with the timeframes set forth in the ECP shall constitute a basis for finding a violation of its terms of probation but recognize that because of, for example, the need to comply with deadlines in both the ECP and AOC or technical challenges in performing the requirements of the ECP, there may be reason to modify one or more of the time periods set forth in the ECP. Should that need arise, the parties shall confer, and the United States in its sole discretion may modify a time requirement in the ECP. In no event shall the time period in Paragraph 5.c. be modified.

   c.   Old Dutch will designate a primary contact person(s) for purposes of this ECP.

   d.   The United States will consult with EPA for expert assistance in defining the work to be performed and reviewing the adequacy of the work that is performed by the Consultant and Old Dutch. However, nothing in the ECP is intended to limit in any way the EPA in obtaining information from Old Dutch about the facility or pursuing administrative and civil regulatory or enforcement actions it deems appropriate to protect public health and the environment.

7.   <u>Environmental Ethics.</u> The purpose of the **Environmental Ethics Program** ("EEP") is to ensure that, going forward, Old Dutch Mustard has a system in place to prevent and detect criminal conduct and to promote an organizational culture that encourages ethical conduct and compliance with the environmental laws by all members of the organization.

   a.   Old Dutch will designate an individual in a managerial position to be personally responsible for this EEP.

   b.   Old Dutch will assure that there is a system in place under which its employees are made aware of how they can report allegations of environmental noncompliance to the appropriate federal, state and local regulatory agencies and to Old Dutch without fear of retribution. U.S.S.G. § 8B2.1(b)(5)(C). The system will enable employees and contractors to make such information known to Old Dutch in an anonymous fashion. Implementation of the program will occur within 45 days of sentencing.

   c.   Old Dutch will provide training to new employees and refresher training for other employees on federal and state environmental statutes and regulations. Such training will be provided to new employees within 30 days of their start date, and refresher training will be given annually. This training will also include the facility's waste management procedures and how they are consistent with the

6

environmental laws and the facility's permit(s), and how employees can report possible environmental violations.

Date: January 16, 2025

JOHN J. MCCORMACK
Attorney for the United States, Acting under
  Authority Conferred by 28 U.S.C. § 515

By: _____
Matthew T. Hunter
Assistant United States Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
Matthew.Hunter@usdoj.gov

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division

By: /s/Ronald A. Sarachan
Ronald A. Sarachan
Trial Attorney
Environmental Crimes Section
150 M Street N.E., Suite 4.108
Washington, D.C. 20002
Ronald.Sarachan@usdoj.gov

I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this Environmental Compliance Program and Environmental Ethics Program. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.

Date: Jan 16,2025

Charles R. Santich
Charles Santich
President and Owner of Old Dutch Mustard Co., Inc.,
d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this Environmental Compliance Program and Environmental Ethics Program with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date: _____

_____
S. Amy Spencer, Esquire

_____
Mathew J. Todaro, Esquire
Outside Environmental Counsel

Attorneys for Old Dutch Mustard Co., Inc.,
d/b/a Pilgrim Foods. Inc.

7

environmental laws and the facility's permit(s), and how employees can report possible environmental violations.

Date:_____

JOHN J. MCCORMACK
Attorney for the United States, Acting under
    Authority Conferred by 28 U.S.C. § 515

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division

By:_____
    Matthew T. Hunter
    Assistant United States Attorney
    53 Pleasant St., 4th Floor
    Concord, NH 03301
    Matthew.Hunter@usdoj.gov

By:_____
    Ronald A. Sarachan
    Trial Attorney
    Environmental Crimes Section
    150 M Street N.E., Suite 4.108
    Washington, D.C. 20002
    Ronald.Sarachan@usdoj.gov

I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this Environmental Compliance Program and Environmental Ethics Program. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.

Date:  _____                     _____
    Charles Santich
    President and Owner of Old Dutch Mustard Co., Inc.,
    d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this Environmental Compliance Program and Environmental Ethics Program with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date:  _____                     _____
    S. Amy Spencer, Esquire

    _____
    Mathew J. Todaro, Esquire
    Outside Environmental Counsel

    Attorneys for Old Dutch Mustard Co., Inc.,
    d/b/a Pilgrim Foods. Inc.

7

environmental laws and the facility's permit(s), and how employees can report possible environmental violations.

Date:_____

JOHN J. MCCORMACK
Attorney for the United States, Acting under
   Authority Conferred by 28 U.S.C. § 515

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division


By:_____

   Matthew T. Hunter
   Assistant United States Attorney
   53 Pleasant St., 4th Floor
   Concord, NH 03301
   Matthew.Hunter@usdoj.gov

By:_____

   Ronald A. Sarachan
   Trial Attorney
   Environmental Crimes Section
   150 M Street N.E., Suite 4.108
   Washington, D.C. 20002
   Ronald.Sarachan@usdoj.gov


I, Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, the defendant, and empowered to bind Old Dutch Mustard in the matter, have read this Environmental Compliance Program and Environmental Ethics Program. I fully understand and, on behalf of Old Dutch Mustard, accept the terms thereof.


Date: _____                    _____

   Charles Santich
   President and Owner of Old Dutch Mustard Co., Inc.,
   d/b/a Pilgrim Foods, Defendant

I have reviewed and explained this Environmental Compliance Program and Environmental Ethics Program with Charles Santich, the President and owner of Old Dutch Mustard Co., Inc., d/b/a Pilgrim Foods, who is empowered to bind Old Dutch Mustard, the defendant, and he has advised me that he understands and accepts its terms on behalf of Old Dutch Mustard.

Date: __01/16/2025__                    _____

   S. Amy Spencer, Esquire


_____

   Mathew J. Todaro, Esquire
   Outside Environmental Counsel

   Attorneys for Old Dutch Mustard Co., Inc.,
   d/b/a Pilgrim Foods. Inc.

7

# Exhibit 1 to
## Old Dutch Mustard Co., Inc., d/b/a/ Pilgrim Foods, Inc. Environmental Compliance Program and Environmental Ethics Program

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 1**

_____
                                        )
**IN THE MATTER OF**                    )
                                        )        **DOCKET NO: CWA-AO-R01-FY25-23**
OLD DUTCH MUSTARD CO., INC.             )
D/B/A PILGRIM FOODS, INC.,              )
                                        )
Respondent                              )
                                        )        **ADMINISTRATIVE ORDER**
Proceeding under Sections 308(a) and    )        **FOR COMPLIANCE ISSUED ON CONSENT**
309(a)(3) of the Clean Water Act,       )
33 U.S.C. §§ 1318(a) and                )
1319(a)(3)                              )
_____)

## I.  STATUTORY AUTHORITY

The following Findings are made, and ADMINISTRATIVE ORDER issued ON CONSENT

("AOC") pursuant to Section 308(a) and Section 309(a)(3) of the Clean Water Act (the "Act" or

"CWA"), 33 U.S.C. §§ 1318(a) and 1319(a)(3). Section 309(a)(3) of the Act grants the

Administrator of the U.S. Environmental Protection Agency ("EPA") the authority to issue orders

requiring persons to comply with Sections 301, 302, 306, 307, 308, 318, and/or 405 of the Act

and any permit condition or limitation implementing any of such sections in a National Pollutant

Discharge Elimination System ("NPDES") permit issued under Section 402 of the Act, 33 U.S.C.

§ 1342. Section 308(a) of the Act, 33 U.S.C. § 1318(a), authorizes EPA to require the submission

of any information required to carry out the objectives of the Act. These authorities have been

delegated to the EPA Region 1 Administrator, and, in turn, to the EPA Region 1 Director of the

Enforcement and Compliance Assurance Division (the "Director").

The Order herein is based on EPA's finding of violations of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Pursuant to Section 309(a)(5)(A) of the Act, 33 U.S.C. § 1319(a)(5)(A), the Order provides a schedule for compliance which the Director has determined to be reasonable.

## II. DEFINITIONS

Unless otherwise defined herein, terms used in this Order shall have the meaning given to those terms in the Act, 33 U.S.C. §§ 1251 *et. seq.*, and the regulations promulgated thereunder.

## III. STATUTORY AND REGULATORY FRAMEWORK

1.      The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

2.      To accomplish those objectives, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person except in compliance with certain sections of the CWA, including, where applicable, an NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

3.      Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."

4.      Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, chemical wastes and industrial wastes discharged into water.

5.      Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States" which is further defined in 40 C.F.R. § 120.2.

OLD DUTCH MUSTARD CO., INC.,                                    Order for Compliance
EPA Docket No. CWA-AO-R01-FY25-23                              Page 2 of 32

6.      Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines a "point source" as including "any discernable, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged."

7.      Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires a permit for storm water discharges associated with industrial activity.

8.      EPA regulations define the term "storm water discharge associated with industrial activity" to include storm water discharges from facilities involved in food preparation, including those classified as Standard Industrial Classification ("SIC") Code 2099. 40 C.F.R. § 122.26(b)(14)(xi).

9.      Pursuant to CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and EPA's implementing regulations at 40 C.F.R. § 122.26, a storm water discharge associated with industrial activity is prohibited except as authorized by an NPDES permit.

10.      On September 29, 1995, EPA issued an NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("1995 MSGP") (60 Fed. Reg. 50804). EPA re-issued the Multi-Sector General Permit for Industrial Activities on October 30, 2000 ("2000 MSGP") (65 Fed. Reg. 64746), on September 29, 2008 ("2008 MSGP") (73 Fed. Reg. 56572), on June 16, 2015 ("2015 MSGP") (80 Fed. Reg. 34403), and on February 19, 2021 ("2021 MSGP") (86 Fed. Reg. 10269).

11.      The 2015 MSGP became effective on June 4, 2015. Although the expiration date for the 2015 MSGP originally was set for June 4, 2020, it was administratively continued until March 1, 2021, the date on which the 2021 MSGP became effective. The 2021 MSGP remains in effect.

12.     The MSGP covers stormwater discharges from industrial facilities in areas where EPA is the NPDES permitting authority, as is the case in New Hampshire.

### New Hampshire Water Quality Standards

13.      The State of New Hampshire requires that all surface waters meet and maintain specific water quality standards, with distinct water quality standards for Class A (the highest quality) and Class B (the second highest quality) waterways. N.H. Rev. Stat. § 485-A:8.

14.     The Souhegan River is a Class B waterway and has been listed as Class B since no later than 1991.

15.     Class B waterways are required to meet a numerical pH range between 6.5 and 8.0, unless readings outside of this range are the result of natural causes. N.H. Rev. Stat. § 485-A:8. .

### IV. PURPOSE OF THE AOC

16.     Old Dutch Mustard Co, Inc. d/b/a Pilgrim Foods, Inc. ("Pilgrim Foods") conducts activities at 68 Old Wilton Road, Greenville, New Hampshire (the "Facility"). The purpose of this AOC is to design and implement an environmental compliance program to ensure that no unauthorized discharges of pollutants from the Facility's manufacturing activities or areas, storage areas, waste handling activities, and related infrastructure enter the Unnamed Stream or the Souhegan River either directly or indirectly via stormwater or groundwater.

### V.  STATEMENT OF THE PARTIES

17.     The allegations within the following sections of this AOC are made solely by EPA. In executing this AOC, Pilgrim Foods neither admits nor denies any of the findings, factual

background, or alleged violations. Without an admission of liability, Pilgrim Foods consents to the issuance of this AOC and agrees to abide by the terms stated herein.

### VI. FINDINGS

18.     Pilgrim Foods conducts activities at the Facility that fall under the following SIC Codes: 2099 – Food Preparations, Not Elsewhere Classified (Primary); 2033 – Canned Fruits, Vegetables, Preserves, Jams, and Jellies; and 2035 – Pickled Fruits and Vegetables, Vegetable Sauces and Seasonings, and Salad Dressings.

19.     The 1995 MSGP and subsequent issuances of the MSGP, including the 2000 MSGP, the 2008 MSGP, the 2015 MSGP, and the 2021 MSGP, apply to facilities conducting activities under SIC Major Group 20, which includes SIC Codes 2099, 2033, and 2035. 40 C.F.R. § 122.26(b)(14)(xi). Therefore, the MSGP applies to the Facility.

20.     On September 1, 2015, Pilgrim Foods submitted a Notice of Intent for coverage under the 2015 MSGP.

21.     Pilgrim Foods became authorized to discharge stormwater and allowable non-stormwater under the 2015 MSGP on October 30, 2015.

22.     Section 2.2.1 of the 2015 MSGP required Pilgrim Foods to control its stormwater discharges to meet all applicable water quality standards, including New Hampshire's water quality standards.

23.     On May 27, 2021, Pilgrim Foods submitted a Notice of Intent for coverage under the 2021 MSGP.

24.     On July 26, 2021, EPA authorized Pilgrim Foods to discharge stormwater and allowable non-stormwater associated with industrial activity under the 2021 MSGP.

25.     Section 2.2.1 of the 2021 MSGP requires Pilgrim Foods to control its stormwater discharges to meet applicable water quality standards, including New Hampshire's water quality standards.

### VII. FACTUAL BACKGROUND

26.     Pilgrim Foods has been operating the Facility since about 1972.

27.     At its Facility, Pilgrim Foods produces vinegar and mustard for both wholesale and retail customers.

28.     The Facility includes a vinegar building, tank farm, mustard building, and production and warehouse buildings, as shown in the Facility's site plan provided by Pilgrim Foods in its Stormwater Pollution Prevention Plan ("SWPPP"), dated December 2021.

29.     The principal process at the Facility is acetification of ethanol into vinegar, which generates wastewaters containing acetic acid.

30.     The Facility's front entrance is located less than 1,000 feet from the Souhegan River, a navigable water that flows into the Merrimac River, which drains into the Atlantic Ocean.

31.     A stream (the "Unnamed Stream") flows under the Facility before resurfacing just south of Old Wilton Road and flowing into the Souhegan River, a traditional navigable water.

32.     As a relatively permanent tributary of the Souhegan River, the Unnamed Stream is a water of the United States and, therefore, for purposes of the CWA, a navigable water.

33.     As a surface water of the State of New Hampshire, the Unnamed Stream is a Class B waterway and has been classified as a Class B waterway since no later than 1991. N.H. Rev. Stat. §§ 485-A:2, 485-A8.

34.    Pilgrim Foods discharges stormwater associated with industrial activity from three outfalls near the southern edge of its property: Outfall 001, Outfall 002, and Outfall 003.

## VIII. ALLEGED VIOLATIONS

35.    EPA alleges that on at least 323 instances since November 23, 2019, Pilgrim Foods discharged pollutants from permitted outfalls at its Facility. These discharges did not meet the permitted effluent limitations set forth in the 2015 MSGP and 2021 MSGP. Specifically, Pilgrim Foods' Facility had low-pH discharges that did not meet New Hampshire's water quality criterion for pH levels in Class B waterways.

36.    Each violation of the pH limits in the 2015 and 2021 MSGPs constitutes a separate violation of a condition or limitation in an NPDES permit issued under CWA Section 402, 33 U.S.C. § 1342, and is a violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

37.    EPA alleges that on at least 329 instances since November 23, 2019, Pilgrim Foods caused unpermitted discharges of pollutants from permitted outfalls at its Facility.

38.    Each unpermitted pollutant discharge constitutes a separate violation of Section 301(a) of the Clean Water Act. 33 U.S.C. § 1311(a).

## IX. ORDER

Accordingly, pursuant to Section 308(a) and Section 309(a)(3) of the Act, it is hereby ordered that Pilgrim Foods shall comply with the following:

### Water Quality Monitoring

39.    Pilgrim Foods shall perform **water quality sonde monitoring** as follows:

   a. As of the Effective Date[1] of this Order, Pilgrim Foods shall perform water quality monitoring using sondes to record pH, temperature, and specific conductivity measurements every five minutes at the following locations identified in the site plan included with Pilgrim Foods' December 2021 SWPPP:

      i. Upstream Brook Access Point,

      ii. CBY17, and

      iii. Downstream Brook Access Point.

   b. Pilgrim Foods shall provide results on a biweekly basis, in the form of an electronic spreadsheet, to EPA and the New Hampshire Department of Environmental Services ("NH DES"). Pilgrim Foods shall provide these results within five Days[2] of the end of each biweekly period.

   c. Water quality monitoring sondes shall be installed and verified according to the manufacturer's recommendations. In the event that winter weather conditions prevent safe access or proper operation of the sondes, monitoring may be temporarily suspended. In the event of very low flow or no flow conditions in the stream, monitoring may be temporarily suspended. Within 24 hours of suspending monitoring, provide written notice of the date and time at which monitoring was

---

[1] "Effective Date" is defined in Section XI. General Provisions below.
[2] "Day" means a calendar day. In computing any period of time for a deadline under this Order, where the last day would fall on a Saturday, Sunday, or federal or state holiday, the period runs until the close of business of the next business day.

suspended and the reason for suspending monitoring. Monitoring shall be resumed as soon as conditions permit. During any period that monitoring is suspended, the monitoring locations shall be inspected, and weather forecasts reviewed each business day to assess the resumption of monitoring. During such periods, at least every week, provide written notice to EPA and NH DES summarizing daily inspections and weather forecast reviews. Within 24 hours of resuming monitoring, provide written notice to EPA and NH DES of the date and time at which monitoring was resumed.

40.    As of the Effective Date of this Order, Pilgrim Foods shall perform precipitation monitoring, creating an hourly log of the following information from Pilgrim Foods' onsite weather station:

   a.   The presence or absence of precipitation;

   b.   Precipitation depth (if any);

   c.   Precipitation type (*e.g.*, rain, snow, mix of rain and snow);

   d.   The presence or absence of snow melt; and

   e.   Whether or not the precipitation event meets the criteria in Paragraph 41, below, for wet weather acetic acid monitoring.

Pilgrim Foods shall provide the results of its precipitation monitoring on a biweekly basis, in the form of an electronic spreadsheet, to EPA and NH DES.

41.    As of the Effective Date of this Order, Pilgrim Foods shall perform **acetic acid monitoring**. Grab samples shall be collected as described below and analyzed for acetic acid

using an appropriate method. Within 30 Days[3] of taking the grab samples, email the analytic results, and the location, date, and time of sampling to EPA and NH DES.

a. <u>Wet Weather Monitoring</u>

At a maximum frequency of once per calendar week, during the first 120 minutes of each storm event with greater than or equal to 0.1 inches of precipitation occurring at least 72 hours from any previous storm event with greater than or equal to 0.1 inches of precipitation, a grab sample shall be collected at the Upstream Brook Access Point and the Downstream Brook Access Point. If collection during the first 120 minutes of a storm event is impracticable, a grab sample should be taken as soon as possible, provided that Pilgrim Foods submits with its monitoring results a description of why a grab sample during the first 120 minutes was impracticable.

b. <u>Dry Weather Monitoring</u>

At least once per calendar quarter, at least 72 hours following any precipitation event of 0.1 inches or more (*i.e.*, dry weather conditions), a grab sample shall be collected at the Upstream Brook Access Point and the Downstream Brook Access Point.

c. <u>Low-pH Event Monitoring</u>

At least once during each event during which all three of the following conditions are met, a grab sample shall be collected at the Upstream Brook Access Point and the Downstream Brook Access Point:

   i. pH of below 5.0 pH units measured at the Downstream Brook Access Point;

   ii. pH measured at the Upstream Brook Access Point, at the same time as (i), that is at least 0.5 pH units higher than the pH as measured at the Downstream Brook Access Point; and

   iii. the conditions described in (i) and (ii) above must occur for one hour or more.

### Facility Engineering Investigation

42. Not later than 60 Days after the Effective Date of this Order, Pilgrim Foods shall propose to EPA one or more licensed and insured engineering firms with expertise in the evaluation of conveyance and controls of process lines in industrial facilities (together, the "Proposed Engineering Experts," and individually, "Proposed Engineering Expert") to be hired by Pilgrim Foods to conduct a comprehensive evaluation and engineering investigation of Pilgrim Foods' Facility consistent with the "Engineering SOW" described in Paragraphs 46 and 47 (the "Facility Engineering Investigation"). Prior to any decision by Pilgrim Foods to hire a Proposed Engineering Expert to conduct the Facility Engineering Investigation, Pilgrim Foods shall demonstrate to EPA that each of the Proposed Engineering Experts meet both the "Competency Criteria" and "Independence Criteria" described below. To that end, Pilgrim Foods shall submit

to EPA the resume(s) for such Proposed Engineering Expert(s), as well as any other documentation demonstrating that each Proposed Engineering Expert is qualified to conduct the Facility Engineering Investigation. Pilgrim Foods agrees that it will not hire any Proposed Engineering Expert that EPA determines does not meet either the Competency Criteria or the Independence Criteria.

   a. *Competency Criteria*: The Proposed Engineering Expert meets the following competency criteria:

      i. The Proposed Engineering Expert has experience related to the evaluation of conveyance and controls of process lines at facilities with complex industrial processes;

      ii. The Proposed Engineering Expert is knowledgeable about the industry codes and standards, and the state and federal environmental obligations that apply to the Facility;

      iii. The Proposed Engineering Expert has experience designing or evaluating systems to meet such industry codes, standards, and environmental obligations that apply to the Facility (or has access to someone who does have such experience); and

      iv. The Proposed Engineering Expert has the ability to perform condition assessments of subsurface assets, such as Closed-Circuit Television inspecting, pipeline pressure testing, dye testing, and smoke testing (or has access to someone who does have such ability).

      b. *Independence Criteria:* The Proposed Engineering Expert meets the following criteria for independence from Pilgrim Foods:

          i. The Proposed Engineering Expert will not receive any financial benefit at any time from the outcome of the Facility Engineering Investigation, apart from compensation for conducting such investigation; and

          ii. The Proposed Engineering Expert has not provided services to Pilgrim Foods within the past five years and has not provided any services with respect to the Facility at any time, unless these requirements are waived by EPA.

43. Should EPA determine that a Proposed Engineering Expert does not meet the Competency Criteria or the Independence Criteria, EPA shall describe the shortcoming(s) within 15 Days of receiving Pilgrim Foods' proposal. EPA shall provide Pilgrim Foods with an opportunity to respond to, and cure, the alleged shortcoming(s). If all Proposed Engineering Experts are disapproved by EPA and it is not possible to cure the shortcomings of these Proposed Engineering Experts, not later than 60 Days after EPA's disapproval, Pilgrim Foods shall propose to EPA one or more Engineering Experts consistent with Paragraph 42.

44. Within 15 Days of EPA's deadline to disapprove of a Proposed Engineering Expert under Paragraph 43, Pilgrim Foods shall hire to conduct the Facility Engineering Investigation a Proposed Engineering Expert that (i) meets the Competence Criteria and Independence Criteria and (ii) that has not been disapproved by EPA.

a.  Within 15 Days of Pilgrim's hiring of a Proposed Engineering Expert (the "Engineering Expert") , Pilgrim Foods will provide EPA and NH DES with a copy of the contract between Pilgrim Foods and the Engineering Expert.

b.  Pilgrim Foods' contract with the Engineering Expert to conduct the Facility Engineering Investigation shall contain a conflict-of-interest provision affirming that (i) the Engineering Expert meets the Independence Criteria; (ii) the Engineering Expert shall act impartially and in compliance with all professional standards and obligations when performing all activities under this Section; and (iii) unless the following requirement is waived by EPA, the Engineering Expert will not provide any services with respect to the Facility for two years after performing the Facility Engineering Investigation. Such a waiver shall not be unreasonably withheld.

c.  Pilgrim Foods shall provide to the Engineering Expert sufficient funding and unrestricted access[4] to its Facility to allow the Engineering Expert to conduct a thorough and independent engineering investigation of the Facility and to accomplish the "Engineering Objectives" described in Paragraph 47 of this Section. Once hired, EPA and NH DES shall be copied on all written communication between Pilgrim Foods and its representatives, and the Engineering Expert.

---

[4] "Unrestricted access" to the Facility shall not include access to confidential documents such as personnel files unrelated to the purpose and completion of the Engineering Objectives as described in Paragraph 47.

45.    The Engineering Expert shall submit to EPA for review and approval by EPA a detailed Engineering SOW by no later than 60 Days after submission of the contract between Pilgrim Foods and the Engineering Expert to EPA and NH DES.

46.    The Engineering SOW shall describe the Engineering Expert's proposal for conducting, at a minimum, the following activities: (i) a comprehensive evaluation of the conveyance of raw material and product at the Facility; (ii) a comprehensive evaluation of the storage of raw material and product at the Facility; (iii) a mass balance evaluation of inputs and outputs at the Facility; and (iv) a comprehensive evaluation of flows conveyed through stormwater infrastructure at the Facility.

47.    In addition, the Engineering SOW shall describe the Engineering Expert's plans to accomplish the following "Engineering Objectives":

    a.    Independently investigate and determine the location, purpose, and condition of all piping runs, tanks, storage vessels, and related Facility processes.

    b.    Independently investigate and determine process inputs of all chemicals, process water, and any other relevant inputs to the Facility's footprint.

    c.    Independently carry out a mass balance determination of inputs vs. output (product) and waste streams, including, but not limited to, stormwater infrastructure, at the Facility. Independently investigate, determine, and quantify all wastes and waste streams produced by the Facility via mass balance calculations and a thorough review of the Facility's relevant records.

d.  Independently investigate and determine the Facility's processes that result in releases, spillage, and/or loss of each of the following from the Facility: product, byproduct, chemicals, wastewater, and process water.

e.  Independently investigate and determine locations within the Facility's footprint, including, but not limited to, all manufacturing processes, wastewater conveyance systems, and related and connected infrastructure, that are the site(s) of releases, spillage, and/or loss of each of the following: manufacturing materials, product, byproduct, wastewater, chemicals, and process water.

f.  Independently investigate and determine the location, condition, and discharge points for all floor drains, roof drains, and any other discrete conveyances, including stormwater infrastructure at the Facility.

g.  Independently investigate and determine causes of past spills and/or releases within 10 years of the Effective Date of each of the following: manufacturing materials, product, byproduct, chemicals, wastewater, and process water, as well as verification of the location of past spills and/or releases of the same.

h.  Independently investigate and determine the location, condition, and discharge points for all piping and infrastructure related to the Facility's former lagoon operations, current groundwater characteristics and flow direction beneath the lagoons, and determine whether the lagoons are a current source of contamination to the Unnamed Stream.

i. Produce a necessary corrective actions report, for any industrial processes that are causing or contributing to manufacturing materials, product, byproduct, chemicals, wastewater, and/or process water escaping the manufacturing process, conveyance systems, and other infrastructure at the Facility, as informed by the investigation in Subparagraphs (a)-(h) of Paragraph 47, including, but not limited to, addressing unauthorized discharges to the Unnamed Stream and Souhegan River.

j. Conduct routine (approximately every 30 Days) video conference calls with EPA to update the agency on the progress of work, findings to date, and next activities planned for the site. Pilgrim Foods shall attend these video conference calls.

48. All of the activities described in Paragraphs 46 and 47 of this Section must be complete and all final reports detailing the activities described in Paragraphs 46 and 47 must be submitted by the Engineering Expert to EPA for review and approval by no later than 1 year following the date of EPA's approval of the Engineering SOW.

**Facility Environmental Site Assessment and Investigation**

49. Not later than 60 Days after the Effective Date, Pilgrim Foods shall propose to EPA one or more licensed and insured environmental engineering and site investigation companies (together, the "Proposed Environmental Experts" and individually "Proposed Environmental Expert") to be hired by Pilgrim Foods to conduct a comprehensive Facility environmental site assessment and investigation consistent with the "Environmental SOW" described in Paragraph

53 (the "Facility Environmental Site Assessment and Investigation"). Pilgrim Foods may submit to EPA a Proposed Engineering Expert who is also a Proposed Environmental Expert. Prior to any decision by Pilgrim Foods to hire a Proposed Environmental Expert, Pilgrim Foods shall demonstrate to EPA that each of the Proposed Environmental Experts that Pilgrim Foods proposes hiring meets both the "Competency Criteria" and "Independence Criteria" described below. To that end, Pilgrim Foods shall submit to EPA the resume(s) for such Proposed Environmental Expert(s), as well as any other documentation demonstrating that each Proposed Environmental Expert is qualified to conduct the Facility Environmental Site Assessment and Investigation. Pilgrim Foods agrees that it will not hire any Proposed Environmental Expert that EPA determines does not meet either the Competency Criteria or the Independence Criteria.

    a.  *Competency Criteria*: The Proposed Environmental Expert meets the following competency criteria:

        i.  The Proposed Environmental Expert has experience related to the evaluation of environmental compliance at facilities with complex industrial processes; and

        ii.  The Proposed Environmental Expert is knowledgeable about the industry codes and standards, and state and federal environmental obligations that apply to the Facility.

    b.  *Independence Criteria:* The Proposed Environmental Expert meets the following criteria for independence from Pilgrim Foods:

        i.  The Proposed Environmental Expert will not receive any financial benefit at any time from the outcome of the Facility

Environmental Site Assessment and Investigation, apart from compensation for conducting such site assessment and investigation; and

ii. The Proposed Environmental Expert has not provided services to the Pilgrim Foods within the past five years and has not provided any services with respect to the Facility at any time, unless these requirements are waived by EPA.

50. Should EPA determine that a Proposed Environmental Expert does not meet the Competency Criteria or the Independence Criteria, EPA shall describe the shortcoming(s) within 15 Days of receiving Pilgrim Foods' proposal. EPA shall provide Pilgrim Foods with an opportunity to respond to, and cure, the alleged shortcoming(s). If all Proposed Environmental Experts are disapproved by EPA and it is not possible to cure the shortcomings of these Proposed Environmental Experts, not later than 60 Days after EPA's disapproval, Pilgrim Foods shall propose to EPA one or more Environmental Experts consistent with Paragraph 49.

51. Within 15 Days of EPA's deadline to disapprove of a Proposed Environmental Expert under Paragraph 50, Pilgrim Foods shall hire to conduct the Facility Environmental Site Assessment and Investigation a Proposed Environmental Expert that (i) meets the Competence Criteria and Independence Criteria and (ii) that has not been disapproved by EPA.

a. Within 15 Days of Pilgrim Foods' hiring of a Proposed Environmental Expert (the "Environmental Expert"), Pilgrim Foods will provide EPA and NH DES with a copy of the contract between Pilgrim Foods and the Environmental Expert.

b. Pilgrim Foods' contract with the Environmental Expert to conduct the Facility Environmental Site Assessment and Investigation shall contain a conflict-of-interest provision affirming that (i) the Environmental Expert meets the Independence Criteria; (ii) the Environmental Expert shall act impartially and in compliance with all professional standards and obligations when performing all activities under this Section; and (iii) unless the following requirement is waived by EPA, the Environmental Expert will not provide services with respect to the Facility for two years after performing the Facility Environmental Site Assessment and Investigation. Such a waiver shall not be unreasonably withheld.

c. Pilgrim Foods shall provide to the Environmental Expert sufficient funding and unrestricted access[5] to its Facility to allow the Environmental Expert to conduct a thorough and independent environmental site assessment and investigation of the Facility and to accomplish the "Environmental Objectives" described in Paragraph 53 of this Section. Once hired, EPA and NH DES shall be copied on all written communication between Pilgrim Foods and the Environmental Expert.

52. The Environmental Expert shall submit to EPA for review and approval by EPA a detailed Environmental SOW by no later than 60 Days after submission of the contract between Pilgrim Foods and the Environmental Expert to EPA and NH DES.

---

[5] "Unrestricted access" to the Facility shall not include access to confidential documents unrelated to the purpose and completion of the Environmental Objectives as described in Paragraph 53.

53.    The Environmental SOW shall describe the Environmental Expert's proposal for conducting the Facility Environmental Site Assessment and Investigation with the goal of ensuring that no unauthorized discharges of pollutants from the Facility's manufacturing activities or areas, storage areas, waste handling activities, and related infrastructure enter the Unnamed Stream or the Souhegan River, either directly or indirectly via stormwater or groundwater. The Environmental SOW shall accomplish, at a minimum, the following "Environmental Objectives":

a.  Independently investigate and determine the depth, flow direction, chemical characteristics and pH levels, and flow rate of groundwater at the Facility. Conduct water quality sampling (to include sampling of existing monitoring wells). Independently determine whether the existing monitoring wells are acceptable for determining the groundwater depth, flow direction, chemical characteristics and pH levels, and flow rate. If the existing monitoring wells are not acceptable for these purposes, drill, install, and sample additional monitoring wells as necessary to fulfill the objectives of this Paragraph.

b.  Independently conduct site sampling and a site investigation at the Facility to determine sources of contamination and low pH, including, but not limited to, all of the Facility's process areas, storage areas, conveyance systems, and related infrastructure that handle product, chemicals, process water, wastewater and other waste materials, and

OLD DUTCH MUSTARD CO., INC.,                                      Order for Compliance
EPA Docket No. CWA-AO-R01-FY25-23                                Page 21 of 32

subsurface conditions and subsurface materials, each of which has the

potential to lower the pH of existing site soil and groundwater.

c.  Independently conduct site sampling and a site investigation of

stormwater discharges during precipitation events, and non-stormwater

discharges during dry weather and during precipitation events, including

review of monitoring performed from April 2014 through the present

pursuant to EPA and State of New Hampshire information requests and

enforcement actions.

d.  Independently conduct a surface water observation at the downstream

sonde location and at least one downstream location on the south side of

Old Wilton Road, including, but not limited to, pH sampling and

observations of Outfalls 001, 002, and 003 to the south and east of the

Facility.

e.  Independently conduct any supplemental sampling and instrument

monitoring of any locations deemed necessary by the Environmental

Expert to determine the source and/or cause of frequent low and high pH

readings in the Unnamed Stream.

f.  Conduct routine (approximately every 30 Days) video conference calls

with EPA and Pilgrim Foods to update the agency on the progress of work,

findings to date, and next activities planned for the site.

54.  All of the activities described in Paragraph 53 of this Order must be complete and

all final reports detailing the activities described in Paragraph 53 must be submitted by the

OLD DUTCH MUSTARD CO., INC.,                                        Order for Compliance
EPA Docket No. CWA-AO-R01-FY25-23                                  Page 22 of 32

Environmental Expert to EPA for review and approval by no later than 1 year following the date of EPA's approval of the Environmental SOW.

### Comprehensive Environmental Compliance Program

55.    Not later than 60 Days after the date(s) on which the reports described in Paragraphs 48 and 54 are approved by EPA, whichever date is later (the "Final Report Approval Date"), Pilgrim Foods shall propose to EPA one or more fully licensed and insured environmental engineering, and site remediation companies (together the "Proposed Remedial Experts" or individually the "Proposed Remedial Expert") to develop and implement a comprehensive remedial plan consistent with the "Remedial Scope of Work" described in Paragraph 60 (the "Comprehensive Environmental Compliance Plan"). Pilgrim Foods may receive proposals from a Proposed Remedial Expert that is also a Proposed Engineering Expert and/or a Proposed Environmental Expert.

56.    Prior to any decision by Pilgrim Foods to hire a Proposed Remedial Expert to conduct the Comprehensive Environmental Compliance Plan, Pilgrim Foods shall demonstrate to EPA that each of the Proposed Remedial Experts that Pilgrim Foods proposes hiring meets both the "Competency Criteria" and "Independence Criteria" described below. To that end, Pilgrim Foods shall submit to EPA the resume(s) for such Proposed Remedial Experts, as well as any other documentation demonstrating that each Proposed Remedial Expert is qualified to conduct the Comprehensive Environmental Compliance Plan. Pilgrim Foods agrees that it will not hire any Proposed Remedial Expert that EPA determines does not meet either the Competency Criteria or the Independence Criteria.

a. *Competency Criteria*: The Proposed Remedial Expert meets the following competency criteria:

    i. The Proposed Remedial Expert has experience related to the evaluation of environmental remediation at facilities with complex industrial processes; and

    ii. The Proposed Remedial Expert is knowledgeable about the industry codes and standards, and state and federal environmental obligations that apply to the Facility.

b. *Independence Criteria:* The Proposed Remedial Expert meets the following criteria for independence from Pilgrim Foods:

    i. The Proposed Remedial Expert will not receive any financial benefit at any time from the outcome of the Comprehensive Environmental Compliance Plan, apart from compensation for conducting such investigation; and

    ii. The Proposed Remedial Expert has not provided services to Pilgrim Foods within the past five years and has not provided any services with respect to the Facility at any time, unless these requirements are waived by EPA.

57. Should EPA determine that the Proposed Remedial Expert does not meet the Competency Criteria or the Independence Criteria, EPA shall describe the shortcoming(s) within 15 Days of receiving Pilgrim Foods' proposal. EPA shall provide Pilgrim Foods with an opportunity to respond to, and cure, the alleged shortcoming(s). If all Proposed Remedial

Experts are disapproved by EPA and it is not possible to cure the shortcomings of these Proposed Remedial Experts, not later than 60 Days after EPA's disapproval, Pilgrim Foods shall propose to EPA one or more Remedial Experts consistent with Paragraphs 55 and 56.

58.    Within 15 Days of EPA's deadline to disapprove of a Proposed Remedial Expert under Paragraph 57, Pilgrim Foods shall hire to conduct the Comprehensive Environmental Compliance Plan a Proposed Remedial Expert that (i) meets the Competence Criteria and Independence Criteria and (ii) that has not been disapproved by EPA.

  a.  Within 15 Days of Pilgrim's hiring of a Proposed Remedial Expert (the "Remedial Expert"), Pilgrim Foods will provide EPA and NH DES with a copy of the contract between Pilgrim Foods and the Remedial Expert.

  b.  Pilgrim Foods' contract with the Remedial Expert shall contain a conflict-of-interest provision affirming that (i) the Remedial Expert meets the Independence Criteria; (ii) the Remedial Expert shall act impartially and in compliance with all professional standards and obligations when performing all activities under this Section; and (iii) unless the following requirement is waived by EPA, the Remedial Expert will not provide services with respect to the Facility for two years after performing the Comprehensive Environmental Compliance Plan. Such a waiver shall not be unreasonably withheld.

c. Pilgrim Foods shall provide to the Remedial Expert sufficient funding and unrestricted access[6] to its Facility to allow the Remedial Expert to develop and implement a comprehensive environmental compliance plan that is (i) sufficient to stop current and prevent future unauthorized discharges of pollutants to waters of the United States, and to eliminate other sources of water quality impairment from Pilgrim Foods' site, and (ii) to accomplish the "Environmental Compliance Objectives" described in Paragraph 60 of this Section. Once hired, EPA and NH DES shall be copied on all written communication between Pilgrim Foods and its representatives and Remedial Expert.

59.    The Remedial Expert shall submit to EPA for review and approval by EPA a detailed Remedial SOW by no later than 180 Days after submission of the contract between Pilgrim Foods and the Remedial Expert to EPA and NH DES.

60.    The Remedial SOW shall describe the Remedial Expert's proposal for conducting, at a minimum, the following "Environmental Compliance Objectives" and include potential alternative measures and the reasons why the Remedial Expert's recommendations are preferred, including relative effectiveness, estimated costs, and estimated timeframe to complete the measures:

a. Ensure that no unauthorized discharges of pollutants from the Facility's manufacturing activities or areas, storage areas, waste handling activities,

---

[6] "Unrestricted access" to the Facility shall not include access to confidential documents unrelated to the purpose and completion of the Environmental Compliance Objectives as described in Paragraph 60.

and related infrastructure enter the Unnamed Stream or the Souhegan River, either directly or indirectly via stormwater or groundwater; and ensure compliance with Pilgrim Foods' MSGP; and

b. Address the findings of the Facility Environmental Site Assessment and Investigation, and Facility Engineering Investigation.

61.    All of the recommended activities set forth in the Remedial SOW must be complete and all final reports detailing the activities described in Paragraph 60 of this Order must be submitted by the Remedial Expert to EPA for review and approval by EPA no later than 2 years following the date of EPA's approval of the Remedial SOW.

62.    Within 2 years of approval of the Remedial SOW, there shall be no unauthorized discharges of pollutants from the Facility's manufacturing activities or areas, storage areas, waste handling activities, and related infrastructure to the Unnamed Stream or the Souhegan River, either directly or indirectly via stormwater or groundwater, except as specifically permitted.

63.    Until further notice, beginning July 1, 2025, and due by each January 1st and July 1st semi-annually thereafter, Pilgrim Foods shall submit a semi-annual compliance report to EPA and NH DES detailing actions taken during the prior 180 Days, towards implementation of the requirements in Section IX of the Order.

## X.  NOTIFICATION PROCEDURES

64.     Where this Order requires a specific action to be performed within a certain time frame, Pilgrim Foods shall submit to EPA a written notice of compliance or noncompliance with such action within seven (7) Days following the applicable deadline; however, written

notice of compliance is not necessary if the action required by the Order is submission of a document, report, or other written material, and Pilgrim Foods has timely submitted such document, report, or written material to EPA.

65.     If noncompliance is reported, the written notice submitted to EPA must include the following information:

   a.   Description of the noncompliance;

   b.   A description of any actions taken or proposed by Pilgrim Foods to comply with the lapsed schedule requirements;

   c.   A description of any factors that tend to explain or mitigate the noncompliance; and

   d.   A date by which Pilgrim Foods will perform the required action.

66.     After notification of noncompliance has been submitted to EPA, Pilgrim Foods must achieve compliance as expeditiously as possible, but by no later than the date Pilgrim Foods submitted to EPA pursuant to Subparagraph 65(d).

67.     Submissions required by this Order shall be sent in electronic format to:

For EPA:

Solanch Pastrana-Del Valle at pastrana-del-valle.solanch@epa.gov, and

For NH DES:

 Teresa Ptak at TERESA.B.PTAK@des.nh.gov

EPA will notify Pilgrim Foods in writing of any changes to the contact person.

## XI.  GENERAL PROVISIONS

68.    This Consent Order shall become effective upon signature by both parties (the "Effective Date"). The Consent Order may be signed in counterparts.

69.    Each undersigned representative of the parties to this Consent Order certifies that the representative is fully authorized by the party represented to enter into the terms and conditions of this Consent Order and to execute the Consent Order and legally bind that party to it.

70.    Pilgrim Foods agrees to accept service of this Order by electronic mail by its counsel Mathew Todaro at: mtodaro@verrill-law.com.

71.    Any material modification to the terms of this Consent Order shall be by written agreement of the Parties. Any nonmaterial modification to the terms of this Consent Order, such as approval of modifications to submissions to EPA or the due dates of such submissions, shall be effective upon written approval from EPA.

72.    For the purposes of this Consent Order, Pilgrim Foods neither admits nor denies the Findings, Factual Background, and Alleged Violations stated herein by the EPA.

73.    This Consent Order does not constitute a permit or a waiver of any further enforcement rights of EPA. Pilgrim Foods waives any and all claims for relief and otherwise available rights or remedies to judicial or administrative review which Pilgrim Foods might have with respect to any issue of fact or law set forth in this Consent Order, including, but not limited to, any right of judicial review of this Consent Order under the Administrative Procedure Act, 5 U.S.C. §§ 701-708.

74.     Pursuant to 26 U.S.C. § 6050X and 26 C.F.R. § 1.6050X-1, EPA is required to send to the Internal Revenue Service ("IRS") annually, a completed IRS Form 1098-F ("Fines, Penalties, and Other Amounts") with respect to any court order or settlement agreement (including administrative settlements), that require a payor to pay an aggregate amount that EPA reasonably believes will be equal to, or in excess of, $50,000 for the payor's violation of any law or the investigation or inquiry into the payor's potential violation of any law, including amounts paid for "restitution or remediation of property" or to come "into compliance with a law." EPA is further required to furnish a written statement, which provides the same information provided to the IRS, to each payor (*i.e.*, a copy of IRS Form 1098-F). Failure to comply with providing IRS Form W-9 or Tax Identification Number ("TIN"), as described below, may subject Pilgrim Foods to a penalty, per 26 U.S.C. § 6723, 26 U.S.C. § 6724(d)(3), and 26 C.F.R. § 301.6723-1. In order to provide EPA with sufficient information to enable it to fulfill these obligations, EPA herein requires, and Pilgrim Foods herein agrees, that:

    a.   Pilgrim Foods shall complete an IRS Form W-9 ("Request for Taxpayer Identification Number and Certification"), which is available at https://www.irs.gov/pub/irs-pdf/fw9.pdf;

    b.   Pilgrim Foods shall therein certify that its completed IRS Form W-9 includes Pilgrim Foods' correct TIN or that Pilgrim Foods has applied and is waiting for issuance of a TIN;

    c.   Pilgrim Foods shall email its completed Form W-9 to EPA's Cincinnati Finance Division at chalifoux.jessica@epa.gov, within 30 Days after the

Effective Date of this Consent Order per Paragraph 68. EPA recommends encrypting IRS Form W-9 email correspondence; and

d.  In the event that Pilgrim Foods has certified in its completed IRS Form W-9 that it does not yet have a TIN but has applied for a TIN, Pilgrim Foods shall provide EPA's Cincinnati Finance Division with Pilgrim Foods' TIN, via email, within five (5) Days of Pilgrim Foods' receipt of a TIN issued by the IRS.

75.  For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 162-21(b)(2), performance of Paragraphs 42-63 of Section IX. Order is restitution, remediation, or required to come into compliance with the law.

FOR UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION 1

**ELIZABETH KUDARAUSKAS**

Digitally signed by ELIZABETH KUDARAUSKAS
Date: 2025.01.16 18:20:38 -05'00'

(dated electronically)

_____

Elizabeth Kudarauskas, Acting Deputy Director, for
James Chow, Director
Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region 1

FOR OLD DUTCH MUSTARD CO., INC. D/B/A/ PILGRIM FOODS, INC.


Jan 16, 2025
_____
Date

*Charles R. Santich*
_____
Charles Santich, President
Old Dutch Mustard Co., Inc.